May it please the Court? I'm Eric Isakson of the Lear Act Coghlan, representing the plaintiffs and appellants in this matter, which deals with the sanctity of the home, the most sacred space in our constitutional Fourth Amendment jurisprudence. In the home, the Supreme Court said, just as Scalia, Redding, and Kylow, all details are intimate details. Let's get a little more specific in terms of Supreme Court opinions we talk about. We have to follow them, even if they're old, when they're in point, under Agostini. And I don't really understand how you distinguish the case from Wyman v. James. I think Wyman is fairly clearly distinguishable. Wyman is a case that starts out saying that there's no search here because what we're dealing with is not agents of the government going into the house to look for evidence of something. What you're dealing with is a social assistance. Wait a minute. Wyman, it's a home visit by the caseworker to see whether the people deserve welfare. It's a home visit by the caseworker to see the family in the home and to make sure that they get the benefits to which they're entitled. And also to make sure they don't get the benefits to which they're not entitled. Well, the Supreme Court said that there is perhaps, and I quote, "...perhaps in a sense both rehabilitative and investigative purpose." It says, "...the latter aspect, the investigative one, is one that's given too broad a character and far more emphasis than it deserves if it's equated to a search under the Fourth Amendment." But then they do go on with that caveat. Justice Blackmun then goes on and goes through a reasonableness of search analysis, doesn't he? Because even if we were to assume that a home visit does possess some of the characteristics of a search in the traditional sense, we nevertheless conclude that the visit does not fall within the Fourth Amendment's prescription and then goes on through the reasonableness analysis thereafter with those eight points or whatever. That's right, Your Honor. Making it look a lot like the special needs analysis that you see in some other cases specifically designated as such. When it comes to whether it's a search, the Supreme Court has held in TLO that if a schoolteacher asks to look in my daughter's purse at school, that is a Fourth Amendment search. It boggles my mind to think that if the district attorney shows up at my doorstep and wants to look in my medicine cabinet, that's not a search. I think it clearly is a search. The reason it's not is you can say, no, don't give me welfare, don't come into my house. Well, there are all sorts of things where the government has a very pressing special need. There's a special need in powerful government interest in administration of the tax laws and stopping tax fraud. That doesn't mean IRS agents can show up at your doorstep and ask to walk through your home to confirm that the dependents are living there, take a look at the laundry, look in the medicine cabinet. As a matter of fact, they can and they do do audits. They do audits. Yes. And audits are reasonably calculated to get the information. You may want to hold off a minute because you're away from the mic. Thank you, Your Honor. Audits are reasonably calculated to get the information that's needed to verify the tax deductions. Project 100 percent isn't looking for that. Well, they're also used to get information to reject deductions and tell the taxpayers they owe more money and to reject claims. A person says, I make $18,000 a year, and they visit the house, and it's a $3 million mansion in Malibu, and they say, gee, there's something wrong here, you know, we're turning it over to the criminal division. They can take a look at the tax records. I don't think they show up and demand to walk through the house unannounced. Audits are scheduled. Audits ask for evidence. There are programs that are permissible, like SL versus Whitburn in the Seventh Circuit, where if the needed evidence isn't provided to show eligibility, then someone goes out to the home to get the confirming information. And if the information can be provided and confirmed without a walk through the home or without searching the home, then it's provided. San Diego's Project 100 percent has none of those balancing characteristics. Well, one of the things Justice Blackmun pointed out, that there was no snooping, as he called it several times in Wyman. So what do you think is snooping? Where's the line drawn in this case? In other words, Wyman seems clearly to allow some kind of home visit. So where does the line get crossed here? What would you scale back the intrusion to here? Well, this case is unprecedented. It's way over the top of any of the cases that have held that home visits are appropriate and are constitutional. It takes an element from this one or an element from that one, combines them all, and increases the invasion of the home by a quantum leap. Now, in Wyman, a social assistance caseworker, someone who can say, I'm from the government and I'm here to help you, shows up to sit down and talk with the applicant and view the kids in the home. Oh, that wasn't Wyman. They weren't there to help them. It was a caseworker investigation. And the only exception they seem to carve out expressly in Section 8, where they say what they're holding does not mean, is an early morning mass raid. But this is not an early morning mass raid. This is non-uniform, not gun-carrying investigators. Well, this is what the Supreme Court says. It says the caseworker is not a sleuth, but rather we trust a friend to one in need. The Supreme Court thinks that's a relative consideration. It is a rehabilitative purpose. The Supreme Court says, and I quote. They also say it's to make sure that the charity is going where it's supposed to, to prosecute. That's right. And that is an important consideration. That's an important, you know, additional interest that's being served there. But it's, you know. Well, that's investigative. I mean, you walk in and you see the $5,000 widescreen TV and the person says, oh, I have all this trouble supporting my children because I don't have a man to help me in a house. And there's obviously a man to help her in a house. That's seeing if the charity is going where it's supposed to go. If you walk in and see the $5,000 widescreen TV because you're there to, you know, deal with the verification, that's a far cry from asking them to go through their laundry. When you open a closet and you see four suits and a bunch of casual clothes and the golf clubs of the person that doesn't live there, supposedly, same thing, isn't it? I don't think so, Your Honor. I don't think that the district attorney, I mean, the county's chief prosecutor is what we're talking about, had a law enforcement initiative. This was, you know, if county welfare services said, we have a special need to send people out into the homes and design a program to do that, that would be a legitimate purpose. You and Gonzalez have said that there has to be a legitimate non-law enforcement need. Here we've got a law enforcement initiative. You know, it's on the agenda and minutes of the board of county supervisors as the district attorney's initiative against fraud. It's exclusively law enforcement, and it's not just, you know, to verify compliance. It's coming from the county's chief prosecutor. People are told that a fraud investigator from the district attorney's office is coming to your home. Why isn't that covered by this paragraph 10 in Justice Blackmun's decision? If the visitation serves to discourage misrepresentation or fraud, such a byproduct of that visit does not impress upon the visit itself a dominant criminal investigative aspect. It's a byproduct, doesn't it? You know, that's not the central concern. That's not the central purpose. You know, the central purpose, according to the Supreme Court, is a rehabilitative one. And here there's no such purpose. That's uncontested. In Wyman, you've got minimal invasions, no snooping in the home. Snooping in the home is forbidden by the New York regulations. You've got the same kind of situation in Los Angeles County where privacy is respected and they don't go and look in the closets. So are you trying to draw a distinction between what's in plain view and what's behind the closet doors? What is the line you're trying to draw? I'm trying to draw a distinction that balances the reasonable expectations of privacy. Well, I understand that, but you keep giving me the generalizations. What is the line you're drawing pragmatically here? Are you saying that they can't come in at all? I think that if there's a for-cause referral, like in S.L. v. Whitburn, we're not challenging that. There doesn't have to be for-cause under Wyman. I mean, Wyman may be distinguishable on its facts, but at a core level, at least those facts set a baseline, do they not, for what a home visit can consist of. Justice Blackmun, dissenting in Griffin, cited his own opinion in Wyman in dissenting against the Griffin intrusion, saying that Griffin was not like the home visit in Wyman. He still thinks it's good law, but he thinks it may be constrained. So what I'm looking for from you is, if we were to agree with you, what would be the level of intrusion that is still permissible under Wyman? I don't think it's permissible to have, across the board, suspicionless entries of the home by the district attorney's office. Just because they're the district attorney's office? That's an important consideration. Wyman says that the caseworker is not police and is not uniformed authority. Here, they are police. They're police officers. They're peace officers. Wait a minute. A PA is not a policeman. They're peace officers. By definition. Some States, they're peace officers. Some, they're not. I don't know if they are in this State. They are. And it's uncontested that they're peace officers, Your Honor. They're in the district attorney's office. The county's chief prosecutor. That's law enforcement. And they come to the door and they show what, you know, looks like a sheriff's badge, indicating that they're with the district attorney, chief prosecutor in the county, public fraud division. Now, the district attorney says, well, you know, we exercise prosecutorial discretion. We don't prosecute people for false statements in that welfare application. Just to make me comfortable, because this has been an issue in Alaska. Caseworkers in Alaska, as I recall, were lobbying, and I can't remember if they got it, for a statute to classify them as peace officers and enable them to carry concealed weapons, before we had the law that let all of us carry concealed weapons without a permit. And as I recall, prosecutors, I don't, I can't remember if prosecutors were classified as peace officers for carrying concealed weapons or not. Do you happen to recall where in the California statutes I can find out that DAs and assistant DAs are peace officers and that they're like policemen? Well, you're not talking about DAs. You're talking about DA investigators. I'm talking about the DA investigators. The DA investigators' testimony is clearly quoted or clearly cited in the statement of the case in my brief. I've got citations that, of the record evidence in that point. In my reply brief, I believe I also cite the California statutes, Your Honor. Now, the fact is that the Supreme Court in Wyman says you've got to look at the totality of the situation, as the other special needs cases say. It goes through something like 12 factors there. Here, if you step back and look at the totality of the situation, you've got a law enforcement initiative from the district attorney's office saying, we're going to assure compliance with the law and assure that there's no fraud. Put that right down the middle with what Wyman v. James says here at page 319, appropriate and paramount interest and concern in seeing and assuring that the intended and proper objects of that tax-produced assistance are the ones who benefit from the aid and dispenses. That's an important consideration, and that's a great concern to the San Diego County's Health and Human Services Agency, and that's one of the reasons they have all-cause referrals to the special investigative unit. This is not that kind of a case. You know, it's not a case like Los Angeles, where you've got the caseworkers going there with dual purposes, and it also is violative of California regulations which say mass or indiscriminate home visits are prohibited. So far, all I've got that I can really get my teeth into to distinguish this case from Wyman is that that's caseworkers and this is DA's office investigators. It's caseworkers. This is DA's office investigators from the county prosecutor. In Wyman, the initiative came from the legislature and the social welfare agencies. Here it's from law enforcement officers. The situation that's presented to the person when the law enforcement agent shows up at the door is, I think, a dramatically different one from the perspective of the public assistance applicant. Well, isn't the scope? I mean, the same paragraph that Judge Kleinfeld reads from goes on to say, surely it is not unreasonable in the Fourth Amendment sense or in any other sense of that term that the State have at its command a gentle means of limited extent and a practical and considerate application of achieving that assurance. Yes, Your Honor. Now, I keep coming back. You mentioned that they're investigators. Let's assume that somebody can go in the door to accomplish the objectives that Wyman lays out as permissible. What else are you saying that the person in the door can or can't do? The person in the door who is there to verify that the applicant lives there and that the applicant is qualified can have a discussion, particularly if they're there to help and make sure that people who need the aid get the aid. Okay. So they're limited to walking in the door, sitting wherever the occupant, the applicant in this case, sits them, be it the living room or the kitchen. They can sit in there. And if they observe something in plain view that's like the big TV screen or they see some man's jacket hanging over the chair, then they can take that into account and do something with it. But is that your point? Those would be the facts of Wyman. Okay. But then if they ask to go into the bedroom or they ask to go into other parts of the house, simply to walk through and look, not to open any cupboards, but simply to verify the number of bedrooms that exist and how they're furnished. That's the facts of Smith. And we're not challenging a program like the program in Smith. They go too far then without any bounds on their discretion. And bounds on discretion are very important to special purposes analysis or special needs analysis. There's no bounds on their discretion as to what they're looking for and what they can look at. It's inappropriate to send them in there to look in the medicine cabinets and look in the closets and go through the dirty laundry and trash. Why wouldn't you look in those three places? They seem like pretty obvious places to find out two things. Number one, do the people who claim to be part of this household actually live there? And number two, do people who are supposedly not part of this household nevertheless live in there? Reasonable expectations of privacy protected under a constitutional system, Your Honor. I see my time is running out. I'd like to reserve what I have left for rebuttal if I might. Thank you, counsel. May it please the Court, Thomas Buntin, Senior Deputy County Counsel on behalf of the County of San Diego and the other county parties here. Let me just address some of the arguments that have been made here. The purpose of the county's home visit program is not to investigate for fraud or to criminally prosecute individuals who have submitted information that turns out later not to be correct. The purpose of the county's Project 100% home visit program is to make sure that eligible people are the ones who are receiving the benefits. It is to investigate, though. It's investigation for the purposes of eligibility, Judge Fischer. And not to do any rehabilitation. In fact, they're instructed not to get into that, correct? Judge Fischer, there's some evidence within the record that establishes, for instance, if an investigator goes out to the home and determines that the individual needs assistance in the form of immediate food stamp aid, that they will, in fact, provide that assistance by informing the appropriate people that that aid is needed. So you're saying the point of having the DA's investigator go to the house is so that the DA's investigator can say, oh, my, you're not getting nearly enough. You should get food stamps. There are four children here, and you only listed three? Judge Kleinfeld, that's not what I'm saying. I'm saying here that that may be a byproduct of what's happening here. That may happen along the way. It may not. But it's not the main purpose. The main purpose here is to determine eligibility for the CalWORKs benefits. And it's investigated because that's why they go around on open closet doors and look in medicine chests and check dirty laundry. It's certainly an investigation. Now, it's clear that with respect to the law. I mean, your investigators say that's what it is. Yes. And that's what they do. It's an investigated purpose. Now, I want to make it clear that there's no gratuitous checking of laundry here. It may be, but still, when we're trying to compare it against Wyman, are you saying that this case is on all fours with Wyman, or will you agree that what is done here goes beyond anything that was done, physically done, in Wyman? I'm saying there are some distinctions between this case and Wyman. I think when you look at the totality of the circumstances, the similarity of the home visits and the ten-part test that the Supreme Court applied in Wyman to find that it was a reasonable search, even if it was a search, that this case comes close to meeting those ten factors. Why doesn't the use of DA investigators instead of welfare case workers distinguish it from Wyman and take away the Wyman protection? In Wyman, the Court was quick to point out that they weren't police officers and that they were not uniformed authority. Here, the same thing applies. These individuals, while they may be investigators employed by the district attorney, are not police officers. They're not in uniform. To address your question, Judge Kleinfeld, the district attorney has specifically said they cannot be armed and has turned down a request that they be armed. That's at tab 81, exhibit 10 of the excerpts of record. So they really have none of the trappings of the traditional police officer that would lead someone to believe that somehow it was compelled here, the home visit under the circumstances. Well, let's look at paragraph 6. The means employed by the New York agency are significant. Mrs. James received written notice several days in advance of the intended home visit. Does that apply here? There is notice, Judge Fischer, in advance of the home visit. It doesn't indicate the specific date and time of the home visit, but if the person But they don't tell them. It's not as scheduled. And clearly the New York, I assume, was specific as to time and time, correct? It was. And in the Essel case, it was not. And the Court said that that wasn't a factor that in and of itself would make this an unconstitutional home visit. We're talking factors here. You said go through the test. So the next thing is that privacy is emphasized. Okay? I'm just reading item 6. The applicant recipient has made the primary source of information as to eligibility. Outside informational sources other than public records are to be consulted only with the beneficiary's consent. Does that all apply here? I think that does apply here under the circumstances. Okay. Forcible entry or entry under false pretenses, that's not present here. It's not forcible entry or under false pretenses. There's no forcible entry. There's no false pretenses. Okay. Or snooping in the home are forbidden. I don't believe there's any snooping. What do you think opening all these doors, you know, these covered doors and going into closets and looking at laundry, whether it's discretionary or not, is? Well, again, this isn't gratuitous snooping. He does not say gratuitous. He does not say gratuitous. He says snooping in the home are forbidden. Justice Kennedy comes over on Number 7 saying Mrs. James refers to no snooping. Those facts are present here. That's what this case is about. Counsel, do you know what snooping is? I don't know what the Supreme Court meant by snooping, but they cite some regs in the HEW handbook and NYCCR something or other. Have you looked those up, and can you tell us what snooping is? Your Honor, I have not looked up those regulations. I do not know what Justice Blackmun said when he referred to snooping. I have always thought that when people go to somebody's house for a party and they look in the medicine cabinet, they're snoopy. To me, it implies something untoward where you're looking just for the sake of the look, not for any specific purpose here. There are people that do that when they go to a party just because they're snoopy and curious. And I'm thinking snooping must have a definition here, and I'd like to know what it is. Well, Your Honor, I would certainly be willing to go back and look at the regulations and brief the Court with respect to that. But you don't know at this point. But I do not know at this point. My assumption is the same, that with respect to snooping, that it means something untoward here where it's for curiosity's sake here. You're just speculating, though, right? I don't know what Justice Blackmun meant when he referred to snooping. If I went into your house and looked at your dirty laundry, I'd be one extreme snoop. On the other hand, if I'm trying to find out if a man lives in a house where, according to the paperwork, he doesn't live, and I find four pairs of men's underclothes in the dirty laundry, I'm thinking, hey, if a guy just dropped in there one night a boyfriend, she wouldn't be washing his clothes for him. Yeah, I think that that's a legitimate reason. So I'm saying maybe it's a legitimate investigative technique, but it sounds kind of snoopy. But I don't know what snoopy means under these regs. I don't hear. And actually, the deposition testimony that's cited involves a situation where the investigator wants to make a determination that the eligible child actually lives in the home. And according to the deposition testimony involving the laundry, she would ask the applicant, could you please show me something that belongs to the child? And under those circumstances, the applicant went to the dirty laundry, because none of the child's clothes happened to be clean at the time, perfectly understandable, went to the laundry, pulled out the piece of clothing and said, here, here's something that belongs to the child. The investigator said, that's fine, and went on. So, again, I don't think that's snooping. And I think there's been an attempt here to sensationalize the facts beyond what they are. Oh, so the way it works is the investigator doesn't look in the hamper to see if it supports the people that are supposed to be there. He says, you show me some reason to think that these four kids live here. And then the woman goes to the hamper, and she shows him the dirty clothes? That's the exact deposition testimony regarding the laundry issue. And that's the only one. But there wasn't a snooping in the dirty laundry. That's correct. That's the only evidence there is regarding laundry. And the factors here is the ---- What about going into the bathroom and opening the medicine cabinet? I think there's some evidence. Well, there's no evidence that the DA investigators themselves opened the medicine cabinets. They're careful to say that if it's the case of any closets or drawers, that they always ask for permission first, and that they always ask the applicant to do the opening and closing here because they're ---- And if they turn that down, then they're denied their application? No. There's no evidence that if they turn down a specific request to view an item, that it's denied. If they decline entirely the home visit and they refuse, then it will be denied. But there's no evidence in the record, and I don't believe it's the case, that if they refuse specific permission to look at, you know, a closet or a drawer or a medicine cabinet, that the application will be denied under those circumstances. Okay. So the record we have, then, is that there are home visits by DA investigators whose primary purpose is to investigate, to verify that the person is qualified, that the money, the charitable money is being spent for appropriate purposes, but that anything that goes beyond what's in plain view, where the home visitor is admitted by the applicant, is all done inside the home, pursuant to a request from the investigator to go beyond where that person is sitting, talking to the applicant, and that if the applicant refuses at that point, there's no adverse consequence. That's correct. That's the evidence that's in the record. If the home visit itself is declined in its entirety, then the benefits will be denied. But if once the home visit is commenced, if, for instance, a specific request is denied, there's no evidence in the record that would indicate that there will be a denial of the benefits under those circumstances. Okay. So the county's position, then, is it stated anywhere in any of the record as to what the policy is, is that the county's position has to be accepted that a home visit simply entails allowing the person into a part of the home and answering questions, and that's all that a home visit requires? Well, I think, again, the walk-through is a part of the home visit program, the walk-through of the home. But, again, the question referred to the specific opening of closet doors. But they would have to allow a walk-through. They would have to allow the walk-through of the home. But, again, not necessarily allow the specifics of, you know, looking at this particular clothing or this particular medicine cabinet or this particular door. So they could keep the closet doors shut. They could walk them into the bedroom, have the doors shut, and decline to open the closet doors, decline to open the medicine chest, decline to open dresser drawers, and no adverse consequences. And that would not result, well, let me be specific, would not result in the automatic denial of benefits. There may be a situation where the prior information obtained during the walk-through would be reported to the HHSA employees, and the prior information, for instance, may have showed nothing that belonged to the child. The resident can be asked, can I look in your medicine cabinet and closets? And she can say no. And it doesn't mean she doesn't get welfare. Automatically. If she's taking care of her elderly mother who has high blood pressure, she might be able to help herself by saying, look in the medicine cabinet, you'll see your high blood pressure medicine that she has to take every morning. Yes, automatically it would not result in the denial. For instance, if the investigator has gone through the house and there's absolutely no evidence that the child, that the person who's receiving the benefits actually lives there, and the applicant then refuses to provide any additional information, such as allowing the closet door to be open to see if the child's clothing is in the closet, then there may be a denial because it may be that all the information that has been obtained will show that there was actually no evidence that the child lived there. What happens at the end of the investigation? Does the DA investigator write a report? The DA investigator writes a report and provides it to the Health and Human Service Agency. And sends it to the welfare agency. Yes. And presumably the welfare agency, somebody there will review it and make some judgment based upon the report. That's correct. The HHSA agency is the one who makes the benefit determination. The investigators do not make the determination as to whether the person is eligible or not eligible for benefits. They report the information that they learned during the home visit. So in other words, if a report comes to us as well, this applicant wouldn't let me see, you know, her medicine chest wouldn't let me see her closet and all this kind of stuff. What might happen then is the like the welfare agency might say, well, I think we need another visit or something like that. Is that right? That's possible. That could happen. It's also possible that they could could say, based upon what we have in front of us, it doesn't appear that the person is eligible. Of course, that's all appealable through California administrative procedures. And you have a right to a hearing before an administrative law judge where you can present whatever evidence regarding. And the same thing with the if there's a if there's a home office home visit refusal, the DA's office then will send a report of that to the welfare agency. That's correct. Welfare agency that would make the determination of non-eligibility. That's correct. The investigators do not make eligibility determinations. This oral argument is interesting. It's changing my view of what's going on if I understand it right. And that's a big if. As I understand it, the way it works is it's not that the investigator says, let me look in a closet, let me look in a dirty laundry, let me look in a medicine cabinet, see if what you are saying is true. Instead, the investigator may walk in and say, wow, this place is neat as a pin. I can't believe a two and a half year old lives here. And then the woman can say, look in a dirty laundry, look in a closet where I put all his toys. Look at look in the medicine cabinet where I put his earache medicine. You'll see a two and a half year old lives here. There may be some distinction. What I was referring to is specifically the laundry example. And the only evidence of anybody looking through anything in the laundry was where the investigator indicated that they had asked this particular applicant, show me some evidence or some indicia that the child is actually here. And the applicant said, well, all the clothes are clean or dirty. So it went to the dirty clothes and picked it up. Well, all right. But as I understand, I mean, you know, maybe the way Judge Kleinfeld describes it happens sometimes. But also, as I understand it, the investigator walking through the house will say the applicant, I'd like to see your medicine cabinet. Will you open it up for me? Right? I think that's true in some cases. And then it's up to her to open it or not. And if she doesn't open it, then it will be so noted in the report. I think it would be noted, but it's not an automatic denial of aid under the circumstances here. And so I think that the county's program, while I agree with Judge Fisher, all the factors are not there. The vast majority of these ten factors are here. In none of the cases that have been examined, the Smith case examined by the state intermediate court here in California, in the Essel versus Whitburn case identified by the Seventh Circuit, not all factors have been on all fours with Whitman or with Wyman, excuse me. But in all of those cases, they found that even if there was a search, it was reasonable because the vast majority of the factors are present, including the most important ones being that the purpose here is not criminal investigation. It fits within the special needs analysis because, as the Supreme Court noted in Griffin and noted in James, this is a circumstances beyond the normal need for law enforcement where a warrant wouldn't be appropriate. And in Wyman, the Court explained in detail why a warrant would not be appropriate. It would mean that there could be forcible entry at all times of the day and the night and that it would imply that there had been some sort of criminal activity. Let me tell you the problem I have. We build on Wyman, which has been overtaken by Kyllo and other cases, and then we get to the special needs as sort of maybe the modern jurisprudence to reconcile the tension between what Kyllo and Justice Scalia's passionate declaration of what the original intent of the Fourth Amendment was, which is to protect the intimacy of the interior of the house. And what we have going on here is an invasion, if you will, by outsiders into the interior of the house. He wrote that when it was simply just scanning heat emitting from the interior of the house. So it's a little hard to ignore the rhetoric, and I don't belittle it. I mean, it's very sincere on his part and the majority that joined it. About the sanctity of the Fourth Amendment and the privacy of the interior of the house, when I look at Wyman, I consider this case to be a clear extension of Wyman, going well beyond what Justice Blackmun back in 1971 and the majority that joined it then, was looking at in terms of the nature of what constitutes a search. So now we jump to Griffin, and Griffin deals with people who are convicted felons who have clearly a reduced expectation of privacy and say, well, welfare applicants per Wyman are on the same level as convicted felons, and therefore if you want welfare benefits, you better be prepared to open up the intimacy of your house, be it they actually open the closet doors or they basically tell the applicant, in essence, if you think you're going to get welfare benefits, you better open those doors. And I find it very hard to find comfortable ground in this case, recognizing absolutely, we're bound by Wyman. So that's my problem with the case. Well, I don't think the Supreme Court in the special needs cases has drawn the line and said there can be under no circumstances home visits or entry into the home here. I didn't say they had. I'm just saying, analogizing to Griffin, which is clearly an intrusive search case, where, as I said, Justice Blackmun himself in dissent objected even to, in Griffin, distinguished Wyman as a pure home visit, a much lesser intrusion. It sends signals that Wyman is not so sacrosanct and clear, nor are the special needs cases that it's easy to resolve this case. Well, I don't think it's an easy case to resolve. Justice Rehnquist's dissent in the city of Indianapolis case talks about home visits or talks about the special needs being for the purpose of entry into the home there in his dissent in that particular case. The district court in this case said that there is a reduced expectation of privacy by welfare beneficiaries. He didn't say that there wasn't any privacy, and he didn't say that they weren't to be treated like criminals as the plaintiffs suggest. He was just saying because of all the information that they're required to provide in order to obtain benefits and because a condition of eligibility is that they must actually live in the residence and the child must live in the residence, that it's reasonable for them to expect that there's a home visit that occurs. Again, with respect to Wyman, in some respects, this is less intrusive than Wyman because there it was, if I could finish, I see my time's up here. With respect to the Wyman home visit, the person was already receiving benefits and the Wyman case authorized continuing home visits for the purposes of making sure that the beneficiary was still eligible. Here we're only talking about a home visit at the commencement. One home visit, not multiple home visits. And so in some respects, the intrusion is actually less here than in the Wyman case where it was multiple visits over a period of time to confirm continued eligibility. Kennedy. I have one more question before I sit down, if it's all right, with Judge Kleinfeld. There are a number of claims under California law, at least with respect to the constitutional claim. Is the analysis, in your view, under the California Constitution the same as it is under the Federal Constitution? Judge, I think it is. The courts have indicated in California that absent cogent reasons, they're not going to depart from the U.S. Supreme Court's interpretation of the Fourth Amendment. And I don't think those cogent reasons are present here. And as we indicated in our brief, that we don't believe that the Parrish decision factually bears any resemblance to this. And it's clear when reading the decision that it was decided under the Fourth Amendment and not under the search and seizure or the privacy clauses of the California Constitution. So, therefore, it is clearly distinguishable and actually not precedent on the issue of the  Okay. Thank you, counsel. Thank you. Counsel, help me on something. There are so many cases that are being discussed. I want to make sure I keep them straight. If I remember right, in Wyman, the Court said it's okay for the caseworkers to go into the house. In Griffin, the Supreme Court said it's okay for the probation officers to go into the   house. The Supreme Court said it's not okay to do the infrared scan of the house. But that was plainly for criminal purposes, and the pot growers were not asking the government to subsidize their heating bills. Have I got the cases right? Am I remembering? I think you know each of the cases quite well, Your Honor. I think your take on them might be a little bit different in some respects. I think that Wyman and the subsequent decisions I think in Kylo, it would be analogous to this case if the pot growers were asking the government for a subsidy for poor people to help with their energy bills because they were using a whole lot of expensive electricity to grow their pot. Well, you know, Your Honor, in the State of Alaska, everybody who is a resident of the State gets a check every year for something around $1,000. It would be sometimes up to close to $2,000. For a family of five, that could be $5,000 to $10,000. I think if the State of Alaska showed up at your doorstep and said that gives us a right to walk through your home or your benefits are going to be revoked, that you'd say no, that's not reasonable. I don't know. I don't know. That case has not come up, but they do check on whether you're really a resident because people do have an incentive to lie about it. Absolutely, Your Honor. And there are a lot of ways to check on things like that. They don't have to be as invasive as Project 100%. With a special needs surge, you have to balance the reasonable expectations of privacy in the most intimate spaces with the home with the need. And here, the need was a manufactured one. The referrals for need-based investigations were falling dramatically when the county district attorney said, I want to have everybody subject to this. They can't show that there's any beneficial results of this. They don't even keep the statistics to do that. Now, counsel said that if somebody refuses to open the closet doors when they're asked, that their benefits won't be denied or might not be denied. I've got to say, that's not the perception of the people who apply to this. It's not what they're told. They're given a notice that says a fraud investigator with the district attorney's office will come to your home. They're shown a videotape that says the authorized representative will come. They'll always show you their official ID. It says district attorney, Bureau of Investigation. Well, that kind of threat does sound to me like the permanent fund. They tell you right on there, if you lie and say you're a resident of Alaska when you're not, we're going to prosecute you for felony perjury and put you in prison. And they show a badge that looks like a sheriff's badge, Your Honor. The videotape says, if you do not cooperate, your benefits will be stopped or denied. So I don't think that people feel they've got a choice when it comes to that stuff. At page 24 of my opening brief, there's testimony from fraud investigators confirming that, while some kind of people will volunteer to open drawers and open closets, if they don't volunteer, they're asked. And if they don't, and I quote, we would ask them to please open the closet. And she goes on to testify that they ask them to open dresser drawers and they ask them to look in the closets. The county of San Diego has reported to the state human services agency that they ask people to open the closet doors and they go through the closets and drawers and such. So it's not as innocuous as the county is suggesting. You look at the special needs cases. You need to have a nonprotectual special need unrelated to law enforcement. This is a law enforcement program from the district attorney's office. It has to be reasonable under the circumstances, justified as its inception. Again, the inception here is questionable. It has to be reasonably related in scope to the circumstances that justified it. This is the only county in California, of 58 counties, that has a program like this. Nobody else thinks they need a program like this. Los Angeles has a program where caseworkers go to the home, but I think that's materially different. And if the constitutional issues are too difficult, I have to submit that the regulatory rules are pretty clear. Mass or indiscriminate home visits are prohibited. Unless you have some questions. Thank you, counsel. I see my time is up. Thank you very much. Thank you both. Well argued. Yes, it was. Thank you. And we're a lower federal court. We don't interrupt you in the middle of the word they. Well, maybe even they don't now in the new Supreme Court. Maybe not. We haven't seen that. Sanchez versus County of San Diego is submitted. No, I'm sorry. Yes. Yes. Well, we can hear.
judges: Kleinfeld, Tashima, Fisher